May it please the court. Good morning, Ethan Ballo, today speaking for Eduardo Arriaga. I'm going to do my watch my clock. I'll do my best to save two. I'm going to start with the three challenges to 924 C conviction. I'll begin with the sufficiency of the evidence challenge. As government counsel admitted to the district court, quote, the unique circumstances of this case is that the defendant allowed the CI to handle the defendant's gun in a way that would be unlawful. In a manner that is inconsistent with our theory that the gun was used for protection in this gun transaction, period, close quote. That's ER 121. This court's work in Crouse, Mann, and Rios compelled the conclusion that there was insufficient evidence that Eduardo Arriaga intended to use the firearm to promote or advance the drug trafficking transaction that was caught on videotape. Two issues of law before I get to the facts. One, as we know, mere possession of a weapon is not sufficient. And the court, this is the court's work in both Mann and Rios, excuse me. The prosecution must prove, quote, the defendant intended to use the firearm to promote or facilitate the crime. The evidence here as shown on the videotape reflects that Juan Flores, who is the government's confidential informant, showed up at Mr. Arriaga's home before Mr. Arriaga was there. And he interacted with other individuals in the garage. There's about two, at least two men there and a woman. They talked. They're listening to music before Mr. Arriaga shows up. During the transaction, Mr. Flores notices there's a gun on the couch that's accessible to all persons. So this is different than Mann and the notion of strategic location where a firearm could be secreted only available to the defendant and not to everyone. Mr. Flores notices the gun and talks about it with Mr. Arriaga, at which point he asks for the gun. Flores takes the gun. The testimony from Mr. Flores is that he unloaded it. But then Mr. Flores takes the gun and dismantles it. He disassembles the weapon completely so it's unusable. Arriaga confessed ignorance. That's why he did it. He didn't understand how to take apart the gun. That's why Flores is assisting him. Can we back up for a minute? Yes, Your Honor. The government partial response to this is, well, but that wasn't the only transaction for which he had this gun or which he could have, the jury could have found he had the gun. Or at least that, more specifically, that the charge was having, possessing what, 50 grams? More than 50 grams. Right, more than 50 grams. And for purposes of distribution and that, he had the gun to protect the whole 50 grams with respect to any other transaction that might occur. And I have one question, first of all, which is whatever happened to the original charges three and four in the indictment? The original charges? There was a separate, there was a count three and four. Count three was the July transaction. And I just dropped out of, it's in the indictment, but it never seems to show up again. And I'm just curious about what happened to it. I don't know what happened to those charges. I know what he went to trial on, but let me ask. It didn't go to trial on it? No. He was tried on counts one and two. So then the question is whether, apparently there is some evidence. There is evidence that the, in the July transaction, the gun was sitting there the whole time. And I think there's some evidence that it was loaded at the time. No, I think you're talking about the April transaction. I'm sorry, what? I think you're talking about the April transaction. No, I'm talking about the July transaction. The July transaction, he alleges he sees two guns. He doesn't identify them as the same gun. One's in a bag. One's also on the couch. He wasn't tried on that theory. I know he wasn't tried on it. But the government seems to be relying on it as evidence that he had the gun to protect the 50, more than 50 grams, even if not with regard to that particular transaction. Well, there's three problems with that. And I think that is their argument, Your Honor. One, we're only concerned about the April transaction. So the question is, what evidence is it that it was for protection of the possession on that date? Well, are we only concerned with the April transaction or are we only concerned with the April possession, which involved more than the transaction? Well, I'll take the April possession. That's how it's alleged, even though the case was really tried on a distribution theory. But there's no evidence that the gun, take on or about, wasn't removed on the 30th, wasn't removed on May 1st, wasn't removed on May 2nd. There's no evidence that that gun remained there. There was no evidence that the methamphetamine remained there. Typically, these cases are found when they do it. The theory that they're espousing the gun is generally for protection is when a search warrant reveals a gun strategically located during a search warrant next to narcotics. And the government raises the argument that that's the explanation, and the defendant has to rebut that argument. In this case, we have a video. The evidence is what happened on that date in April. And there's no evidence that apart from this moment in time that's caught on video, the gun's ever present again or the methamphetamine's ever present again. They do a search on the house. They don't find the weapon. They don't find any methamphetamine. So I don't think that gets them out of the sufficient evidence at trial that Mr. Arriaga I don't think I really understand the answer here, though, because not all of the meth was sold in this transaction, right? So you have a video of the gun and the drugs, and why isn't it a reasonable inference that even if he's friends with this guy who's buying drugs right now, he needs the gun for the next guy who's going to come along and buy the rest of the meth? Where's the evidence of the next guy? Well, I don't know. I mean, you just said the meth is gone, so where'd it go? I don't know. But it's the government's burden to prove beyond a reasonable doubt that after Flores leaves, Mr. Arriaga maintains the gun in a strategic location and maintains the methamphetamine at the same location. And so the question that there's no evidence of that, and it's their burden to prove that BRD. Well, certainly the minute after the informant leaves, he still has the gun and the rest of the meth. And he might have put the gun away. He might have unloaded the gun.  We don't know. It's their burden of proof. Do we even know if that gun was ever put back together again? No, we do not. There's no evidence he ever retrieved the gun. They talk about it later in the conversation, and he says the gun is broken or it doesn't work. So I don't think their alternative theory works. Why is it the minute after instead of the minute before? What case tells us we need to know that after is the relevant time to think about why he had the gun? Well, the gun we know the minute before is, even the minute after, the gun is not strategically located in the words of Krause and Mann or Rios. The gun is available to everybody. If this whole business about taking the gun and taking it apart and all that hadn't happened, the fact that he had a loaded gun sitting visibly on the couch while he's conducting a drug transaction is probably enough, no? I would disagree. I think strategic location is the word of Krause. It's when a gun is located in a way that the seller can get it surreptitiously to protect himself. That is the case. He doesn't want to get it surreptitiously. Maybe he wants the guy to know he has a gun. Well, an open gun that's available to everyone doesn't support the inference that he's intending to further the transaction. It's available to the people he's protecting. Because the buyer could seize the gun? That's right. Yes. The buyer could seize the gun. In this case, the buyer disassembled the gun, and it's inconsistent with an intent to further the transaction. The other two points I'd raise before moving on. One other thing. Sorry, Your Honor. You say there's no evidence. There was some evidence, this expert. But the expert, was the expert an expert on — he might have been an expert on some — on a fair amount of stuff having to do with the direct transaction. But with regard to why this gun — why the gun thing happened, i.e., why he gave him the gun and let him take it apart, it seems — did he have any expertise on that? Those were the two points I was going to make. Let me put it right there, Your Honor, as my time runs. The last thing I want to say before moving to that question, Your Honor, is look at the video closely. The notion that he was intimidated, that Flores was intimidated, is farcical. Watch the video. Listen to what he's saying. Watch his conduct with the gun. I tried to watch the video. It's very difficult to do. So stipulated, Your Honor. So you asked about the expert testimony. I think you're right. First, Rios tells us that general evidence, like an expert saying drug dealers usually have guns, is insufficient as a matter of law. That's Rios. Done. That's settled law. But let's talk about Mancini, which is what goes to the heart of your question. We challenged methodology, the trial counsel trial methodology. His methodology — Yes. But what you didn't do was separate out his — I mean, it seemed to me that it's quite possible that he was sufficiently voir dire as to his expertise about drug transactions in general. You didn't really separate this out. But with regard to this particular problem, i.e., why would this guy give him the gun, he said it was very unusual, and he basically made it up. Exactly. Two things. One, methodology. Here was his methodology on voir dire, which without a 104 hearing like Hanke, the judge sustains his expertise. This is Mancini's testimony. When one spends as much time as I have talking to people that sell drugs, you tend to acquire a certain expertise as how they operate, you know, 363. That's no methodology. Let's get to your question. But even if it were, even if it were, what about as to this point? Exactly. But isn't this case one of experience? Well, his experience says it's unique. The government says it's a unique circumstance, and this is him on — this is Mancini when they ask him about the gun. He says, I can imagine why he would do that. This is rank speculation. It's not — he's never seen this before. But wasn't there an objection at that point, though, saying this expert, even if we know he's an expert on drug transactions, he doesn't have an expertise in what he's about to say? They challenged him. They challenged — made a plenary challenge to his testimony that he didn't have reliable methodology to testify about these subjects. The judge did not provide a 104 hearing. The methodology — If that's not a good — I mean, if that objection was just generally he doesn't have a good methodology but actually he knows a ton about drug transactions because he's been a cop doing it for so long, then maybe that was a bad objection. It doesn't seem like it was reformulated when the intent thing is the point. Oh, I would disagree respectfully, Your Honor. Kumho Tyer says they need to establish a methodology to have reliable evidence. This isn't just expertise in a subject matter area. The substance has to be reliable based on a methodology that's applied. In this case, Mancini testifies speculatively. I can understand the reason why. And then in the — But what I'm asking — maybe I misunderstood the record of when the objection was made, but I thought the objection was this expert can't testify about anything about drug transactions. And if we disagree with you about that because we think he was enough of an expert to do that, then when was it reformulated to be precise about this? I think it was a broad objection to his testimony, which is sufficient to cover the claim and he could cover the specific argument that this testimony was speculation, not based on methodology, unreliable, and not established under 702. It also would support the 704B challenge. When you look at his testimony, he adopts a first person, not — this is what drug dealers do. If you did this, if you take away the ammunition supply but you really want your customer to know what I do have a gun to defend myself with, I'm about to show you a larger quantity of drugs that you might just want to come back in 5, 10 minutes, 2 hours from now to rob me of. I have a gun. It's a real gun. You can even look at it. Just know I have a gun to defend myself, so please keep us on a business footing and don't come back and rob me because I'm really armed. That's the ultimate issue. That's not a third person. This is what drug dealers do. This isn't about other drug dealers. Well, whatever. It also isn't terribly responsive to what happened because he took the gun apart. Right. So when he walked out, there wasn't an operable gun. Yeah. He rendered it useless. And the last piece on this, I know I'm running out of time. But there was more evidence, too. The other evidence was that the confidential informant said he felt intimidated. Right. And you look at the video. I think that's not sustainable. I don't think it's sustainable. He could be intimidated by a gun. He's disassembled. The weapon is useless. But ultimately, this is a sufficiency of the evidence. With the sufficiency of the evidence, it can be reversed on the expert testimony and the supplemental instruction was insufficient. The government claims weight. What do you think the instruction should have been? Mere presence is not – mere possession is not enough. You must find a defendant intended to possess the gun to advance or promote. But the problem is that wasn't your first request when – or Ariaka's first request that there be no additional instruction? Yes. No, he – Right. So your position was that they didn't need to have anything more. And so – That's the waiver argument. In other words, that's where I think the invited error is, not in the agreement to have the one sentence instead of two. But your invited error was you don't really need to explain anything else. Well, let me take that in two ways. Invited error is – it's actually – we don't even call it invited error anymore after Perez. It's – Well, whatever you want to call it. It was – It's waiver. It's waiver. And is it waiver or forfeiture? You look at Al-Rahim. You were on the panel for Judge Fletcher's opinion. You have to know that the lawyer intentionally relinquished a known right. Look at ER 11 to 17 when they discuss this. It is plain that Al Giugni has no idea what the law is. They're discussing Lopez. He gets it wrong. He doesn't know Krauss, Mann, or Rios. Worse, he doesn't understand, and he says they should apply Lopez – Oh, I see. I'm sorry. Al Giugni, the defense lawyer. Okay. So he – it's forfeited, not waived. But that doesn't matter. I mean, unless you're making an ineffective assistive counsel claim. I would respectfully disagree under Al-Rahim. If he doesn't know the law and is intentionally relinquishing it, then it's a forfeit error subject to plain error review, not waiver subject to no review, and then only subject to 2255. And because he gets Lopez wrong and thinks it's a Lopez issue, where the judge doesn't have to initially instruct on in furtherance, which Lopez teaches, it's a Bolenbach issue. Didn't jury instruction 19 say that the defendant possessed the firearm in furtherance, that the jury has to find that? Yes. So what's wrong with the original instruction that was given? Nothing, and that's not my complaint. Under Bolenbach and Castillo-Mendez, when a jury has a question, the court has a new responsibility. The second instruction, it was more specific and more in favor of the defendant. So how can A plus B equal zero? Oh, no. I would disagree. The jury expressed confusion as the district court and the government recognized on pages 11 to 17 of the ERs. Under Castillo-Mendez and Bolenbach, the judge then, the initial instructions are out at that point. The district judge must clear away that confusion, and sending them back to the district. The additional instructions aren't out. I mean, quite often it's quite adequate just to say go back and read the instructions. I would respectfully disagree. Look at then-Judge Kennedy's decision in Warren. Look at Powell from 1965. If it's correct, it doesn't matter. You have to clear away the jury's confusion, and this answer did not clear away the confusion. The district court was required to do more. Al Giugni forfeit that error, but on plain error of view, if you look at Castillo-Mendez and Bolenbach, he had an obligation to give the correct answer, which comes from Mann, Rios, and Kraus, which is mere possession isn't enough, and you have to use it to advance or promote. Simply referring back to the general instructions is condemned by Powell and Warren, even if they're accurate.  Your time is up. Thank you very much.  We'll give you a minute in rebuttal. I appreciate it, Your Honor. Good morning. May it please the Court. My name is Philip Kopsinsky, and I represent the United States. I'll take those issues in order, if I may. So starting with sufficiency of the evidence, our response is one the Court already picked up on, which is that this charge was larger than 15 grams. The indictment alleged 50 grams or more of methamphetamine. So the transaction that occurred that day in April with the confidential informant is evidence that the intent was to distribute that pound of methamphetamine, but it is not the extent of the government's case. Judge Friedland, you noted that both before as well as after, that gun can be there to protect the defendant's pound of methamphetamine. There was testimony that a pound of methamphetamine is a valuable commodity. All right. But when the informant was done with the gun, it was inoperative. So you need at least some evidence as to after that it was put back together or could have been put back together. And as to before, the — it seems to me that at least with regard to this transaction, if that's what we're talking about, what happened afterwards is somewhat informative or quite informative about his intent of why he had the gun for this transaction. So two responses, Your Honor. First of all, just now is the first I've heard the idea that the gun was inoperative afterward. I don't know that the video shows that. It's not something I've — Well, he disassembled the gun. And I believe put it back together. My recollection is he takes the slide off and puts the slide back on. I don't know that that's — Is that all he did, to disassemble it? I believe that's what they're talking about, is how — It's a small handgun, how the slide comes off, goes back on. The CIA also testified that before receiving the gun, Arriaga had taken the clip out so it's unloaded. Right. You said that. Right. I don't know that the video or the testimony specifically said it was left. I mean, that also suggests he didn't have this gun to intimidate anybody because he disarmed it. So — Not anybody. This guy. I mean, so — I mean, in other words, if we focus on this transaction, it seems to me that you have a pretty weak case. Well, look, setting aside the sufficiency of the evidence standard and the fact that we're entitled to all those presumptions, I agree. There is some conflicting evidence here, and we acknowledge that in the district court. On the one hand, the CIA says I was intimidated in that situation. Now, again, setting aside that the jury — Unloaded gun. It was unloaded. Exactly. It was unloaded. And he was handed — it was unloaded. He was handed the gun. He took it apart. What was intimidating about that? That he is being shown a gun. And I agree. At that moment, when the gun is unloaded, obviously it serves no protection purpose at that exact moment. But again, this is where the broader — When was he intimidated? At what point was he intimidated? Well, so the CIA talked about that. He said, in my experience — and what Arriaga is showing me is that he's serious. He's the type of guy who not only has a pound of methamphetamine, he's the type of guy who has firearms. So he — you don't mess with him. So is the idea that there were probably other guns, and that's what's actually intimidating? Could be other guns. Could be he comes back — if he was thinking in his mind he'd get some buddies and come back later for that full pound, knowing it's worth $5,000 or more. He's disinclined to do that because he knows Arriaga is the type of guy that has guns. As I say, I acknowledge that if we set aside the presumptions of Jackson, that just in that moment, it's unusual. I didn't hear what you just said. If you're satisfied what? I'm sorry. If we set aside the presumptions of Jackson versus Virginia — I don't think we should set it aside, but I don't understand — Well, then I think we have to win just simply on the CIA's testimony. He says, I am intimidated, and the jury must have believed that on the sufficiency of the evidence claim. And depending what intimidated means, I guess. I mean, that isn't the answer, because the answer is whether it was whether he — whether the defendant had it in furtherance of the drug crime. The fact that the CIA felt intimidated because he's weird, because even though somebody had a gun, an unloaded gun, doesn't mean that it was intended to intimidate him. So I think — That's not evidence. How is that evidence of what — why the defendant had the gun for this transaction? Because the gun is at the locus of his drug-dealing activity. That's another fact of it. What? I'm sorry? The locus of his drug-dealing activity is this garage. Right. We know that from the July transaction, the April transaction, that's where the meth is. The Court has repeatedly said that's a key consideration. Is the gun where the drugs are kept? So Mr. Ballot mentioned the example of where we discover with a search warrant. Gun and drugs. But the case law also is that just having the gun where the drugs are kept isn't  No. I think the cases do say that. I think the cases say a gun, readily usable, meaning loaded, close proximity to a stash of drugs. So this is like a search warrant situation. Defendants may be not even home. The cases absolutely say that that is sufficient evidence for — now, maybe it's not an overwhelming case. Maybe that's not a sure winner for us at trial. But if we get the conviction, that's certainly sufficient evidence on appeal. And the cases that have distinguished are things like the gun is unloaded in a safe at the other side of the house, or the gun is kept at some other house where there's no evidence of drug-dealing activity. That's not this case. This case is a loaded firearm, a mere feet from a pound of methamphetamine. Well, it was a loaded firearm until it wasn't a loaded firearm. In this transaction. All right. So, yes, in this transaction. So, therefore, I want to know how we look at any other transaction. I didn't hear the last part. How any other — In other words, are you now saying you understand that if it was just this transaction there would be a problem, but we're supposed to be looking at something else? No, not quite. Do you know what happened to count three and four, by the way? You know, you asked — I don't recall. I remember knowing at one point. All right. Well, they're not there in any event. Somehow they weren't in the trial. Yeah, I don't — I had the same question. I remember finding the answer some time ago, and I'm sorry. All right. Whatever it was, it wasn't convicted of him. So, therefore — Irrelevant now. If he had been, you might not be having this problem. But he wasn't. So, therefore, can we look at that transaction anyway, or can we look at something else? I think that the July transaction helps show that the garage is the locus of drug-dealing activity for this defendant, and that is key for 924C. The Court has said that again and again. More broadly, look, I do think the evidence is sufficient in that moment with the confidential informant to support 924C, but it does not matter because if that transaction was this whole case, then he wouldn't even be guilty of count one, the drug count. That's the only — I don't understand. Sorry. To go back to what you answered before, U.S. v. Krauss says, evidence that a defendant merely possessed a firearm at a drug-trafficking crime scene without proof that the weapon furthered an independent drug-trafficking offense is insufficient. So how can you say it's sufficient? So, again, Your Honor, the cases I am aware of, whether they're cited in these briefs or more broadly in research, the only cases that that statement of law is aimed at are cases like the gun locked in the safe unloaded or the gun in the car and the drug dealing happens in the backyard. Some obvious separation. That's not this case. This case is the loaded gun mere feet from the pound of methamphetamine, moreover, at the location where we know from two separate occasions that the defendant sells drugs. We think that's plainly sufficient. If the April 15th transaction — I'm not sure about that date. If the April transaction was all there was, he wouldn't even be guilty of the drug distribution count because it's merely 15 grams and he's charged with 50 or more grams. This case is about more than those 15 grams. But it's not about more transactions. It's about possession with intent to distribute. Right. There don't have to be any more transactions, as I understand it. That's exactly right. And the gun protects that bigger stash of methamphetamine. We think the jury, on a sufficiency of the evidence challenge, the jury was imminently rational to make that conclusion. If I may, I'll — And that's what — so Krauss articulated that just having the gun's not enough, but then went on to hold that having the guns in the house where you were transacting drugs was enough, right? I mean, that's what Krauss said. That's what Krauss says. And I believe it's Krauss, although it may have been one of the other men or Rios that talks about the case of the gun in the safe. That, I think, is closer to mere possession. Someone has a — Or a box in a truck or something, right? There is also the gun in the truck case. Locked up, I believe, the truck pulls up while officers are executing the search warrant at the campsite. The court says that's not enough. I suppose that's mere possession. That's not this case. And I think, if I may, that's a nice segue to the jury instruction issue, because even setting aside what we think is clear waiver, the supplemental instructions that — Well, you presented it as if the waiver were the agreement to the one-sentence response. But that can't be, because, in fact, they wanted a two — As I understand it, the judge had rejected their original proposal, which was to say nothing. And at that point, they were simply faced with two possibilities, one sentence or two sentences. And they agreed to the one sentence. But that doesn't seem like a waiver of the — Right? Perhaps not. But that's not now what the defense wants. Right. So the real problem is that the waiver was when they said you shouldn't say anything. The waiver, I believe — I would rephrase that a little more broadly. The waiver was strenuously fighting against saying more. So, first, they want nothing. Then they say, all right, well, just the one sentence. And as the government continually says, look, you know, Judge, there is a lot of more case law. We can give the jury more help. The defendant continuously says no. But he never made this proposal, the one he's making now. True. But I don't think any case on waiver has ever said that the exact language needs to be on the table in the district court and the defense needs to reject it. That's not knowingly forfeited. I think that cuts against him, not for him. It cuts against him that he never made this proposal, the one that he's making now. Well, in a way, right, for purposes of preserving it. But I think the broader point is that did he understand that he could tell the jury more from this Court's case law? Of course he did, because that's what the government argued for. Do you want to address the expert question? Sure. Of course. Because it seems to me that without the expert on the sufficiency, you've got a real problem. I mean, they're very connected. Well, I think the CI says a lot of the very same things the expert says. That doesn't go to the why the defendant had the gun. Well, the CI talked about those things. He says, in my experience, drug dealers like to carry guns to protect their drugs. Right. So that testimony comes from the CI. The expert says some of the same things. Anyway, so where's the expert? How is this expert an expert on something that he says is unusual and then he just makes, as far as I could tell, he just sort of makes things up? Well, I don't think he's not making it up, Your Honor. I think he — this is very short, 43 minutes of testimony. The first quarter or half is just him describing all his 25 years of experience with thousands of investigations. And a lot of it is about the drug transaction itself, and that's not an issue now. Right. But as to the gun. Well, I think several points. First of all, I think it is generally inferred from his short testimony that he's experienced throughout. He spent, like I say, a quarter or half of his time explaining his experience. He essentially says he has no experience with this. Well, I disagree. So the language, let's be very precise. There's a lot of fudging from the defense in this case. Let's be very precise. He uses the word uncommon. I would argue that that word suggests he's talking about experience. Is something common or uncommon? That's a factual observation or characterization. So he says, well, I think that's uncommon about handing over a gun. And then a couple of other things. Earlier in his testimony, he had talked about drug dealers commonly having firearms in close proximity to drugs. And he said he knows that because he's executed search warrants on dozens or hundreds of occasions. He talks about the fact that defendants often have a felony prior, and so they will not want to keep a gun on their person because they know that that's an extra crime. And that can help inform reading this situation. And what he says about this situation where the gun is on the couch as opposed to in the defendant's waistband, for example. Also earlier, the expert had talked about, again, from his experience, it is not uncommon for people who possess significant quantities of drugs to be robbed by other people. So he knows that as a factual statement from his experience that robbery is common. So that plainly informs what he says about the gun. And he never says, as counsel said a moment ago, the word imagine. It is not that he is just speculating or making this up out of thin air. He says, I could see some reasons why, and he goes on to name them. He does so in the hypothetical. But all he says is, this is what he says. Would that be unconventional or uncommon? I would have to say yes. Would it be completely outlandish? I would say no. I could see some reasons. Isn't that the same as I can make it up, essentially? I mean, what does it mean I can see? Anybody can reason that way. He doesn't say it based on my experience. He says I can see some reasons. Your Honor, that's true. He does not say based on my experience. I think it is plain from his earlier testimony. He didn't say he had any experience with something like this. He said it was uncommon, and he said he could see some reasons. Yes. And I think given the phrasing of his answer, as well as the things he had talked about just moments earlier in his testimony, that he is speaking from his experience. His entirety of his testimony is from his experience. I think that's plain, particularly the points I just mentioned. He talks about robbery. Your time is up. Thank you very much. Thank you very much. We ask the Court to affirm. Thank you for the extra minute, Your Honor. I appreciate it. I'll make three short points, if I may. One, this goes to, I think, what Judge Friedland has been talking about. Take a look at Krauss and Mann. The question is strategic location to infer intent. And what Krauss says, I think it's Judge Tallman's opinion, is when you have a room full of drugs and there's a cache of firearms that are hidden from view, that only the seller would know them. They didn't say it was hidden from view, did they? Yes, they're an addresser, and that's how he defines strategic location. There's three or four firearms in that room, and he distinguishes those from a shotgun and other guns in another part of the residence. And it's that strategic location which raises the inference. That anyone walking in that room sees there's a transaction, but no one knows there's a gun there but the person who put the gun there. And that raises an inference. Here, before ARIA even gets there, there's a gun available to anybody. We don't know when it gets there. We don't know when it leaves. We know that it's disassembled. We don't know whether it's reassembled. We don't know whether it's ever there again. We don't know whether the meth is ever there again. We know on that 32-minute videotape that it's there and disassembled, that the lack of strategic location is the distinguishing factor which makes it you cannot raise the intent, especially that it's for protection. Not only when it's readily available, but then given to the buyer to disassemble. But the jury was told that they had to find that the gun was in furtherance of the crime, right? Yes. Doesn't that – don't we need to assume that that meant they found it was going to be useful somehow? So strategic location is a reasonable inference of what they thought was going on? I don't believe so. Not on this fact. The facts are they asked to watch that exact video. Then they asked a question. I think the second answer, where it was right to object to the second answer, that wasn't helpful. That was a legal answer. The correct answer under Bolenback should have been mere possession isn't enough. He has to have the intent to advance or promote the drug transaction. And the jury didn't understand that. Their confusion was never cleared away because they were essentially told to review the initial instruction, which under this Court's case law is not a proper response to a jury question. You have to clear away the confusion. Okay. So your time is up. Thank you, Your Honor. Thank you very much. I appreciate it. Thank you both for a useful argument in United States v. Arriaga. And we'll go to the last case of the day, United States v. Lopez Magellan.
judges: Berzon, Friedland, Dominguez